# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

CURTIS MOODY,

                        Petitioner,           :   Case No. 3:18-cv-139

       - vs -                         District Judge Walter H. Rice
                                       Magistrate Judge Michael R. Merz

TOM SCHWEITZER, Warden,
  Lebanon Correctional Institution
                                :
                    Respondent.

# REPORT AND RECOMMENDATIONS

This is a habeas corpus case brought *pro se* by Petitioner Curtis Moody to obtain relief from the state court conviction which has resulted in his imprisonment in the custody of Respondent Warden Schweitzer. The case is before the Magistrate Judge for report and recommendations on the merits upon consideration of the Petition (ECF No. 1), the State Court Record (ECF No. 15), the Answer/Return of Writ (ECF No. 16) and Petitioner's Reply (Traverse Brief)(ECF No. 22).

**Procedural History**

Petitioner was indicted by the Montgomery County Grand Jury on two counts each of felony murder, felonious assault, and having weapons while under a disability, all arising from the shooting death of Jeffrey Farr on July 17, 2014. After his motions to suppress were denied, a jury convicted Moody of the murder and assault charges, and the trial judge convicted him on one of

the two weapons charges. Moody was sentenced to eighteen years to life consecutive to a three-year sentence in another case. He appealed to the Second District Court of Appeals which affirmed the convictions. *State v. Moody*, 2016-Ohio-8366, 2016 Ohio App. LEXIS 5229 (2nd Dist. Dec. 23, 2016), appellate jurisdiction declined, 149 Ohio St. 3d 1421 (2017).

On January 18, 2017, Moody filed in the trial court a petition for post-conviction relief under Ohio Revised Code § 2953.21. The trial court dismissed the petition as untimely and on the merits (State Court Record, Ex. 27). The Second District affirmed on both bases. *State v. Moody,* 2018-Ohio-2561, 2018 Ohio App. LEXIS 2746 (2nd Dist. Jun. 29, 2018), and Moody did not appeal this decision to the Supreme Court of Ohio.

On June 12, 2017, Petitioner filed a Delayed Application for Reopening the direct appeal to raise a claim of ineffective assistance of appellate counsel (State Court Record, ECF No. 15, Ex. 39). The Second District denied relief. *State v. Moody*, CA Case No. 26926 (2nd Dist. Jul. 25, 2017)(copy at State Court Record, ECF No. 15, Ex. 41), and the Supreme Court of Ohio declined appellate jurisdiction. *Id.* at Ex. 46. Thereafter on June 8, 2018, the Second District denied Moody's successive Rule 26(B) application to reopen.

Moody mailed his Habeas Corpus Petition to the Sixth Circuit Court of Appeals on April 17, 2018 (ECF No. 1-1); it was eventually filed on this Court's docket on April 27, 2018. Moody pleads the following Grounds for Relief:

> **Ground One:** [Denial of Motion to Suppress]
>
> **Supporting Facts:** The trial court erred in failing to suppress the photo identification.
>
> **Ground Two:** [Denial of Continuance]
>
> **Supporting Facts:** The trial court denied Moody a fair trial when it refused to grant the continuance motion based on newly-disclosed

evidence which was material to the outcome of the trial which was a *Brady* violation by prosecution.

**Ground Three** [Trial Court abuse of discretion]

**Supporting Facts:** It was an abuse of discretion for the court to permit Zanfta White and Rhonda Alves to be designated as a court witness.

**Ground Four**: [Prejudicial Hearsay]

**Supporting Facts**: Multiple witnesses introduced hearsay statements which did prejudice Moody denying him due process and a fair trial.

**Ground Five**: Fraud on the Court

**Supporting Facts:** The issue of fraud upon the court was presented in my 26(B) delayed appeal which was pending and presented to post-conviction relief as well.

(ECF No. 1, PageID 4, 6, 7, 8, 9).

By amendment, Moody added

**Ground Six:** Ex Parte Communications

**Supporting Facts:** The trial court erred when they allowed ex parte communications to proceed without correction which did violate the defendant's Fifth and Sixth Amendment of United States Constitution as well as rights provided b y statutes authorizing the defendant's presence at all stages of trial.

(ECF No. 7, PageID 35-36).

# Analysis

## Ground One:  Improper Photo Identification

In his First Ground for Relief, Moody claims he was denied due process and a fair trial when the trial court failed to suppress the results of the pretrial photo identifications.  Moody presented this claim on direct appeal as his First Assignment of Error and the Second District decided it as follows:

### II. Pretrial Photo Identifications

**[*P9]**  In his first assignment of error, Moody claims that the trial court "erred in failing to suppress the photo identification[s] of Moody," which violated his right to due process.

**[*P10]**  "Due process requires suppression of pre-trial identification of a suspect only if the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification." *Neil v. Biggers*, 409 U.S. 188, 196-97, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

**[*P11]**  The defendant must first show that the identification procedure was unduly suggestive. "A lineup is unduly suggestive if it steers the witness to one suspect, independent of the witness's honest recollection." (Citations omitted.) *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 208. If the pretrial identification procedure was not unfairly suggestive, any remaining questions as to the identification's reliability go to the weight of the identification, not its admissibility, and no further inquiry into the reliability of the identification is required. *Id.* at ¶ 209; *State v. Williams*, 2d Dist. Montgomery No. 26357, 2015-Ohio-1403, ¶ 13.

**[*P12]**  If, on the other hand, the defendant shows that the pretrial identification procedure was unduly suggestive, the court must then consider whether the identification, viewed under the totality of the circumstances, is reliable despite the suggestive procedure. *Id.* In reviewing the likelihood that the circumstances resulted in a misidentification, courts have considered the opportunity of the witness to view the perpetrator at the time of the offense, the

witness's degree of attention, the accuracy of the witness's prior description of the perpetrator, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. *Neil* at 199-200; *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *State v. Chaffin*, 2d Dist. Montgomery No. 25220, 2014-Ohio-2671, ¶ 16.

**[*P13]** Reliability of the pretrial identification is the linchpin in determining its admissibility. *Manson* at 114. "So long as the identification possesses sufficient aspects of reliability, there is no violation of due process." *State v. Sherls*, 2d Dist. Montgomery No. 18599, 2002-Ohio-939, 2002 WL 254144, *3 (Feb. 22, 2002).

**[*P14]** We review a trial court's refusal to suppress a pretrial identification for an abuse of discretion. *State v. Wilson*, 2d Dist. Montgomery No. 22624, 2009-Ohio-1038, ¶ 19.

**[*P15]** According to the evidence at the suppression hearings, Detective Thomas Cope, a homicide detective with the Dayton Police Department, was in charge of the investigation of the shooting death of Jeffrey Farr on July 17, 2014. Soon after the investigation began, Moody became a suspect in the shooting.

**[*P16]** On July 21, 2014, Cope created a photo spread with six photographs using an application called JusticeWeb. Cope used the latest jail book-in photograph for Moody that was on JusticeWeb — a photo from October 2013 -- and used default parameters for the program to find comparable photographs. Under the default parameters, the program identified individuals that were within five years of Moody's age, within four inches of his height, and within 25 pounds of his weight. Cope provided Moody's race, hair color, eye color, and gender as additional parameters. The computer identified several hundred comparable individuals for the "filler" photographs for the photo line-up.

**[*P17]** Detective Cope manually reviewed the computer-identified comparable photographs and looked for people with similar hairstyles, facial features, photo backgrounds, and skin complexion in an effort to make the photographs "as homogeneous as possible so there's not one that stands out over the others." Cope selected five photographs, and the program created a photo spread, positioning the photographs within the spread at random (Supp. State's Ex. 1/Tr. State's Ex. 374☙). Detective Cope testified that he failed to "save" the photo spread, so that he could reprint it at a later date. When Cope printed the photo spread, one of the pages listed each individual's name and birthdate underneath his respective photo;

Cope testified that this page is kept separately from the rest of the photo spread packet.

[*P18] The July 21 photo spread was shown to Charles Dozier. Dozier identified the individual in photo #1 as the person who "may have shot Jeff," and he initialed next to the photograph he selected. Dozier indicated to the officer who presented the photo spread that "this guy resembles him." Moody's photo was photo #6 in the July 21 photo spread.

[*P19] On July 28, 2014, Detective Cope used JusticeWeb to create a new photo spread. He used Moody's October 2013 photograph and selected five filler photographs from the hundreds of photographs that were generated using the same criteria as before. Two of the five filler photos were the same as those in the July 21 photo spread, and three of the filler photos were of new people. The individual that Dozier had selected was not included in the five filler photos. Detective Cope saved the photo spread as a file on his computer so that he could access it again at a later date.

[*P20] Cope had JusticeWeb generate two photo spread packets with these six individuals (Moody plus the five filler photos). (State's Ex. 2/31 and 3/35.) Although the six photographs were the same in both Exhibits 2 and 3, the computer randomly positioned the photographs in different positions.

[*P21] Detective Rod Roberts, an officer who did not have any involvement in the investigation into Farr's shooting, showed State's Exhibit 2 to Stanley Wilson and State's Exhibit 3 to Raymond Nicholson in different rooms at the police station. Cope did not provide Roberts any information about the suspect or the investigation.

[*P22] Roberts testified that he first administered the photo spread to Wilson. Prior to showing the photo spread to Wilson, Roberts read the photo spread instructions to Wilson verbatim. The instructions read:

> I am going to show you a group of photographs. This group of photographs may or may not contain a picture of the person who committed the crime now being investigated. I do not know who the suspect is. Keep in mind that hair styles, beards, and moustaches may be easily changed. Also, photographs may not always depict the true complexion of a person. Pay no attention to any markings or numbers that may appear on the photos or any

differences in the type or style of the photographs. When you have looked at all of the photos, tell me whether or not you see the person who committed the crime or any other person you recognize. Do not tell other witnesses that you have or have not identified anyone.

Roberts indicated on the form that he was a blind administrator.

[*P23]  Wilson identified Moody's photo, which was photo #2. Detective Roberts asked Wilson to circle the photograph, initial it, and sign at the bottom of the page. Roberts also asked Wilson to write the  number of the photograph he had selected on page 2 of the packet, write what the identified person did, indicate his percentage of certainty, and sign at the bottom of the page. On page 4 of the packet, Wilson put a checkmark next to "YES" for photo #2 and wrote, "He shot Jeff Farr." Detective Roberts then returned the packet to Detective Cope.

[*P24]  Within minutes, Detective Roberts went into a separate interview room to show a photo spread to Nicholson. Roberts employed the same procedure when he presented the photo spread to Nicholson. Nicholson selected photo #3, which was Moody's photo. After Nicholson made his identification and completed the requested portions of the photo spread packet, Nicholson returned the packet to Detective Cope.

[*P25]  On October 22, 2014, Detective Cope generated another photo spread using the same six photographs that he had selected on July 28 (State's Ex. 4/32). JusticeWeb scrambled the photographs so that they were in a different order than either of the photo spreads printed on July 28; Moody's photograph was photo #6.

[*P26]  Detective Cope asked Officer Matt Heiser, an officer who was not involved in the investigation, to present the photo spread to Walter Jackson. The two officers drove to Jackson's residence, and Cope explained to Jackson that Heiser would be conducting a lineup with him (Jackson). Detective Cope then went outside the residence while Officer Heiser presented Jackson with the photo spread.

[*P27]  As with Detective Roberts, Officer Heiser read the instructions to Jackson verbatim and then gave Jackson the photo spread. Jackson identified Moody's photo. Heiser asked Jackson to circle it, initial it, date it, and sign at the bottom. Jackson complied. Officer Heiser wrote on page 2, "As soon as I handed him the photo he pointed at number 6 and said that's him." Heiser checked "YES" next to "photo #6" on page 2, indicating that he had selected that

photo. At this point, Heiser put the photo spread packet back in a folder and walked out of the house to get Detective Cope.

[*P28]  On July 26, 2015, Detective Cope created another photo spread to show to Cosby, again using the six-photo photo spread that he had created on July 28 (State's Ex. 6/36). When he printed the photo spread, the order of the photos was again reshuffled.

[*P29]  Detective Cope asked Detective Cayce Cantrell, a detective with the Special Victim's Unit, to administer a photo spread. Cantrell was unfamiliar with Cope's homicide investigation. Cope introduced Cantrell to Garry Cosby, the witness, and Cantrell took Cosby into the homicide department's conference room and read him the instructions on page one of the photo spread packet. Detective Cantrell initialed the instructions and marked that she was a blind administrator.

[*P30]  Cantrell placed the photo spread in front of Cosby, and he pointed to photo #2, which was Moody's photo, within 15 seconds. Cantrell had Cosby circle and initial the photo that he had selected and sign the page. On page 2 of the packet, Cantrell marked that Cosby had selected photo #2 and had not selected photos #1 and #3-6. On page 3, Cosby filled in the statement that he recognized the person in photo #2 as the person who "shot Jeff." Cosby wrote that he was "sure that's him." Cosby signed the bottom of page 3. Cantrell signed as a witness, and returned the photo spread to Detective Cope.

[*P31]  Moody moved to suppress the pretrial identifications of him as impermissibly suggestive. The trial court overruled the motion, reasoning:

> Defendant did not contest that the witnesses who identified him through the photo line-up had the opportunity to observe him on the night in question. The Court has reviewed the line-ups generated by Cope and finds them to be appropriate. Defendant does not stand out in any way and the other persons in the line-ups have similar physical characteristics. Further, the testimony of Cope, Roberts and Hieser [sic] establishes that the line-ups were appropriately administered by blind administrators. Accordingly, the photo line-up identifications will not be suppressed.

[*P32]  On appeal, Moody focuses on the fact that Charles Dozier identified a person from the July 21 photo spread who was not included in any of the subsequent photo spreads that were shown to

witnesses. Where witnesses were shown versions of the photo spread prepared on July 28 (which did not contain the individual that Dozier had identified), witnesses identified Moody.

[*P33] Upon review of the evidence from the suppression hearing, including the photo spread packets presented to the witnesses, the identification procedure employed by the Dayton police was not unduly suggestive. The photo spreads were presented by blind administrators, and there was nothing in the manner in which the officers administered the photo spreads that would make the presentations unduly suggestive.

[*P34] As to the photo arrays generated by the photographs selected by Detective Cope on July 28, the arrays were computer-generated, using characteristics that were similar to Moody. The photographs had similar backgrounds, and the individuals had similar facial features and hairstyles. We find nothing unduly suggestive in the photographs that were selected. The fact that the photographs selected on July 28 did not include the individual identified by Charles Dozier on July 21 did not render the July 28 photo spread (and the additional photo spreads later created from the same group of photographs) unduly suggestive. The fact that the subsequent photo spreads did not contain the picture identified by Dozier in the first was thoroughly explored by defense counsel. In addition, each of the witnesses was told prior to being shown the photo spread that the perpetrator's photograph might not be present and that some physical features might have changed.

[*P35] The trial court did not err in overruling Moody's motion to suppress. The first assignment of error is overruled.

*State v. Moody, supra.*

When a state court decides on the merits a federal constitutional claim later presented to a federal habeas court, the federal court must defer to the state court decision unless that decision is contrary to or an objectively unreasonable application of clearly established precedent of the United States Supreme Court. 28 U.S.C. § 2254(d)(1); *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 785 (2011); *Brown v. Payton*, 544 U.S. 133, 140 (2005); *Bell v. Cone*, 535 U.S. 685, 693-94 (2002); *Williams (Terry) v. Taylor*, 529 U.S. 362, 379 (2000).

Examination of the Second District's decision on the First Assignment of Error shows that Court applied the controlling Supreme Court precedents, *Neil v. Biggers*, 409 U.S. 188 (1972), and *Manson v. Brathwaite*, 432 U.S. 98 (1977). Moody's Traverse does not suggest any way in which the Second District's decision was either contrary to or an objectively unreasonable application of that case law or rested upon an unreasonable determination of the facts (ECF No. 22, PageID 1572-74. His argument rests on the claim that a person named D.W. was identified as the shooter by witness Charles Dozier, but D.W.'s photograph was not included in subsequent photo arrays shown to other witnesses who identified Moody. That does not make any of the arrays unconstitutionally suggestive. Moody's First Ground for Relief should be denied.

**Ground Two:  Denial of Continuance**

In his Second Ground for Relief, Moody claims the trial court denied him a fair trial and infringed his right to trial by jury when it denied a motion for continuance based on later disclosure of *Brady* material.

Moody raised this as his second assignment of error on direct appeal. The Second District noted that the still photograph to which objection was made had been produced by the State on Saturday, November 7, 2015, as part of a larger disclosure. *State v. Moody, supra*, at ¶ 40. Defense counsel made no written or oral motion for continuance and no showing of prejudice. *Id.* Moody also claimed that the late disclosure violated *Brady v. Maryland*, 373 U.S. 83 (1963), which held the state has a duty to disclose exculpatory and impeachment evidence in a criminal case. The Second District found that the evidence in question, assuming without deciding that it was *Brady* material, was disclosed before trial and hence no *Brady* violation occurred. *State v. Moody*, supra,

at ¶ 45.

Contrary to the Second District's finding, Moody claims an oral request for continuance was made, but examining the trial transcript at the place he cites (Tr. Tr. at 342-43, State Court Record ECF No. 15-3, PageID 823-24) does not show any such motion. Moreover, far from showing the late-disclosed material was *Brady* material, Moody argues that it was "used extensively for bolstering the state's argument." (Reply, ECF No. 22, PageID 1579). In other words, it was not exculpatory.

The decision to grant or deny a motion for continuance lies within the sound discretion of the trial court and cannot be reversed absent a showing that the decision was arbitrary, unreasonable, or unconscionable. *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964). But there cannot be an unconstitutional denial of a continuance if none is requested and there was no request here. The Second Ground for Relief is without merit and should be dismissed.

**Ground Three: Trial Court Abuse of Discretion**

In his Third Ground for Relief, Moody claims the trial court abused its discretion in designating Zanetta White and Rhonda Alves as court witnesses. This claim was raised as part of Moody's Third Assignment of Error on direct appeal. The Second District found as a matter of fact that White was never designated as a court witness. *State v. Moody, supra*, at ¶58. Rhonda Alves is Moody's mother and was only designated a court witness after her "initial evasive testimony." *Id.* at ¶ 62. The court of appeals thus found no abuse of discretion in designating her as a court witness. *Id.*.

As indicated by the Second District, Ohio law treats the question of whether to designate

someone as a court witness as a matter committed to the trial judge's discretion. Federal habeas corpus is available only to correct federal constitutional violations. 28 U.S.C. § 2254(a); *Wilson v. Corcoran,* 562 U.S. 1 (2010)*; Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Smith v. Phillips*, 455 U.S. 209 (1982), *Barclay v. Florida,* 463 U.S. 939 (1983). "[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); see also *Elmendorf v. Taylor*, 23 U.S. (10 Wheat.) 152, 160 (1825)(Marshall C. J.); *Bickham v. Winn*, 888 F.3d 248 (6th Cir. Apr. 23, 2018)(Thapar concurring). Whether or not a state trial judge has abused her or his discretion is not a constitutional question. To put it another way, abuse of discretion does not by itself rise to the level of a due process violation. *Sinistaj v. Burt,* 66 F.3d 804 (6th Cir. 1995). Moody's Third Ground for Relief should therefore be dismissed.

**Ground Four:  Hearsay**

In his Fourth Ground for Relief, Petitioner asserts that there were multiple instances of hearsay testimony admitted, some over objection and some to which his attorney did not object.

The assertion that inadmissible hearsay had been heard by the jury was presented to the Second District Court of Appeals as part of Moody's Third and Fourth Assignments of Error and that court denied relief on these claims. *State v. Moody, supra*, at ¶¶ 63-79, 84-105.

This Court cannot review hearsay issues raised in the Second District because all of them were raised and decided as state evidence law questions. To put it another way, the Constitution does not forbid hearsay evidence or concern itself with that issue unless the habeas court is dealing

with an alleged violation of the Confrontation Clause, which is not involved with the hearsay claims raised here.

Moody's Ground Four should be dismissed because he did not present it as a constitutional claim to the Second District and it is not otherwise cognizable as a constitutional claim.


**Ground Five:  Fraud on the Court/Prosecutorial Misconduct**


Moody does not identify in his Petition what action or actions he claims constituted a "fraud on the court."  However, in his Reply/Traverse Brief, he argues the Fifth Ground for Relief as one of prosecutorial misconduct (ECF No. 22, PageID 1589-1597).  Moody claimed the prosecutor engaged in misconduct in seven different ways in his Fifth Assignment of Error on direct appeal and the Second District decided the assignment as follows:

### VI. Prosecutorial Misconduct

 **[*P106]**  Moody's fifth assignment raises prosecutorial misconduct. He states that the prosecutor engaged in misconduct in seven respects:

• Without declaring the witnesses hostile, the State continuously and with multiple witness used leading questions on direct examination
• By introducing substantive and prejudicial evidence which otherwise would not have been made available through the guise of impeachment of Rhonda Alves and Zaneta White (and impeachment of Rhonda Alves by Detective Cope)
• By failing to disclose to defense counsel cruiser cam videos intended for trial until two days prior to the trial which were later improperly used as substantive and prejudicial evidence
• By instructing the jury as to whose testimony was credible and whose testimony was not credible in closing statements
• By instructing the jury * * * that all elements were met
• By using improper and inflammatory remarks in the rebuttal closing [argument] insinuating Defendant was lying and that defense counsel was taking them on detours in regards to evidence which was not favorable to the state

• By using a summation which asked that justice be extended even to [the apartment complex].

For the reasons set forth in other assignments of error, above, we reject the first, second, and third claims of prosecutorial misconduct.

**[\*P107]** The test for prosecutorial misconduct is whether the prosecutor's remarks or questions were improper and, if so, whether they prejudicially affected substantial rights of the accused. *State v. Exon*, 2d Dist. Clark No. 2014-CA-106, 2016-Ohio-600, ¶ 40, citing *State v. Jones*, 90 Ohio St.3d 403, 420, 2000 Ohio 187, 739 N.E.2d 300 (2000). A prosecutor's conduct during trial cannot be grounds for error unless the conduct deprives the defendant of a fair trial. *State v. Williams*, 2d Dist. Montgomery No. 24548, 2012-Ohio-4179, ¶ 51, citing *State v. Apanovitch*, 33 Ohio St.3d 19, 24, 514 N.E.2d 394 (1987). The focus of the inquiry [\*\*46] is on the fairness of the trial, not on the culpability of the prosecutor. *State v. Bey*, 85 Ohio St.3d 487, 496, 1999 Ohio 283, 709 N.E.2d 484 (1999).

**[\*P108]** Where it is clear beyond a reasonable doubt that the jury would have found the defendant guilty, even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed. *See State v. Underwood*, 2d Dist. Montgomery No. 24186, 2011-Ohio-5418, ¶ 21. We review allegations of prosecutorial misconduct in the context of the entire trial. *State v. Stevenson*, 2d Dist. Greene No. 2007-CA-51, 2008-Ohio-2900, ¶ 42, citing *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

**[\*P109]** In general, prosecutors enjoy a wide degree of latitude during closing arguments. *State v. Whitfield*, 2d Dist. Montgomery No. 22432, 2009-Ohio-293, ¶ 12. They may freely address what the evidence has shown and what reasonable inferences may be drawn from that evidence. *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990); *State v. Black*, 181 Ohio App.3d 821, 2009-Ohio-1629, 911 N.E.2d 309, ¶ 33 (2d Dist.). "However, prosecutors must refrain from making misleading insinuations and assertions as well as expressing personal beliefs or opinions regarding the defendant's guilt. Prosecutors must also refrain from alluding to matters unsupported by admissible evidence. 'It is a prosecutor's duty in closing arguments to avoid efforts to obtain a conviction by going beyond the evidence which is before the jury.'" (Citations omitted.) *State v. Richmond*, 2d Dist. Greene No. 2005 CA 105, 2006-Ohio-4518, ¶ 15, quoting *State v. Smith*, 14 Ohio St.3d 13, 14, 14 Ohio B. 317, 470 N.E.2d 883 (1984).

**[\*P110]** In addition, prosecutors may not make statements that are "so inflammatory as to render the jury's decision a product solely of passion and prejudice against the appellant." *State v. Williams*, 23 Ohio St.3d 16, 20, 23 Ohio B. 13, 490 N.E.2d 906 (1986). "Where it appears that prosecutorial comments constituted an invitation to the jury to go beyond the evidence or were so flagrant as to incite the passions or prejudice of the jury, and thereby deny the accused a fair trial, prejudicial error may inhere." *State v. Slagle*, 8th Dist. Cuyahoga No. 55759, 1990 Ohio App. LEXIS 2426, 1990 WL 82138, \* 9 (June 14, 1990), citing *State v. Price*, 60 Ohio St.2d 136, 140, 398 N.E.2d 772 (1979).

**[\*P111]** Moody did not object to the prosecutor's closing or rebuttal argument. Accordingly, he has waived all but plain error.

**[\*P112]** First, Moody claims that the prosecutor inappropriately vouched for the credibility of the State's witnesses.

**[\*P113]** An attorney may not express a personal belief or opinion as to the credibility of a witness. *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 117, citing *State v. Williams*, 79 Ohio St.3d 1, 12, 1997 Ohio 407, 679 N.E.2d 646 (1997). "In order to vouch for the witness, the prosecutor must imply knowledge of facts outside the record or place the prosecutor's personal credibility in issue." *Id.*, citing *State v. Keene*, 81 Ohio St.3d 646, 666, 1998 Ohio 342, 693 N.E.2d 246 (1998).

**[\*P114]** In contrast, "[a] prosecutor may comment upon the circumstances of witnesses in their testimony, including their interest in the case, their demeanor, their peculiar opportunity to review the facts, their general intelligence, and their level of awareness as to what is going on. The prosecutor may conclude by arguing that these circumstances make the witnesses more or less believable and deserving of more or less weight." (Citation omitted.) *State v. Clay*, 181 Ohio App.3d 563, 2009-Ohio-1235, 910 N.E.2d 14, ¶ 47 (8th Dist.), quoted by *State v. Jeffery*, 2013-Ohio-504, 986 N.E.2d 1093, ¶ 21 (2d Dist.).

**[\*P115]** Moody cites the following statement by the prosecutor:
\* \* \* I told you how Jeffrey Farr was not alone at that lot. I told you how he was there with friends, acquaintances, people standing in close proximity to Jeffrey Farr. I told you how each of those witnesses would walk through those doors, how they'd take that stand and how they would tell you, *credibly tell you*, about the

events that unfolded on July 17th, 2014 at [the lot]. The State delivered on that promise.
(Emphasis added.)

 **[\*P116]**  The prosecutor then proceeded to discuss the testimonies of the State's witnesses. The prosecutor discussed what facts may be gleaned from the coroner's testimony regarding the wounds to Farr's body and summarized the testimonies of the eyewitnesses. The prosecutor repeatedly reminded the jurors that they were "the credibility judges of the witnesses" and that they would need to judge whether it was reasonable for various witnesses to have left the scene and for witnesses not to have come forward immediately after the shooting.

 **[\*P117]**  Although the prosecutor stated that several witnesses testified "credibly," this part of his argument was immediately supported with references to the witnesses' testimony and the generally consistent story that the eyewitnesses and physical evidence provided. In short, the prosecutor's statements regarding the witnesses' credibility were supported by reference to the evidence presented, and not based on knowledge of facts outside the record or the prosecutor's personal belief in the witnesses. We find no improper vouching by the prosecutor.

 **[\*P118]**  Second, Moody claims that the prosecutor improperly made derogatory comments about defense counsel during rebuttal closing argument by referring to defense counsel's arguments as "detours." The prosecutor stated:

> You know, [the other prosecutor] has given you an excellent road map to follow in arriving at your verdict, and please, if you remember anything that we say here this morning, remember this. Follow the evidence. Follow the testimony because it's only when you follow the evidence that you will be able to arrive at a true and just verdict.
> Don't be caught going down detours. What do I mean by that? Don't let yourselves be talked into going down a detour that the Defense suggests to you that is of no consequence to the case, that  is nonsensical in nature. Stay true to the path and follow the evidence.
>
> What do I mean by detours that are of no real consequence? Things like no DNA found at the scene that matches back to the Defendant; things like no fingerprints were found, things like there was not a description of the gun that was given specifically by the witnesses; things like different

dates of statements. Those are just some examples of what I mean by detours, and we'll talk about it.

Let me just say this. These detours will lead you to a dead end and it's only upon following the evidence and staying on the path that you will be able to reach a just true word. [sic.]

What are some examples of other types of detours? Well, you all as the jurors are the arbiters of the fact. You decide the facts of the case. You will have to use your collective recollection when it comes to what the testimony was from each of the individual witnesses. And Defense Counsel made some statements up here as to what he said the witnesses testified to, and I made some notes because I just don't recall that being the fact or the case as to what these people testified to, and I will give you some examples. But you all will be the ones that have to decide based on your recollections.

The prosecutor next discussed portions of different witnesses' testimony that the prosecutor said defense counsel had misreported. The prosecutor then argued that the factual circumstances of this case did not lend themselves to having DNA evidence or fingermark evidence.

 **[*P119]**  We find nothing in the prosecutor's remarks that rendered Moody's trial unfair. Although the prosecutor was critical of defense counsel's argument (as opposed to defense counsel personally), the prosecutor merely argued to the jury why defense counsel's argument should not be persuasive, why the absence of certain evidence was irrelevant to the case before them, and why the testimony of the witnesses, which implicated Moody, should be credited and given primary consideration. The prosecutor's characterization of defense counsel's arguments as "detours" was not unfairly prejudicial.

 **[*P120]**  Moody further cites as misconduct the prosecutor's statements that Moody "should not be rewarded" for the absence of DNA and fingermark evidence and the absence of the murder weapon itself. Viewed in the context of all of the closing arguments, we do not agree that this is misconduct.

 **[*P121]**  Defense counsel's closing argument focused on the lack of an investigation and the lack of physical evidence. Defense counsel noted that only Farr's DNA was found at the scene, there

were no cell phone records, there were no fingerprints, and there was no video recording of the incident. In asking the jury not to "reward" Moody for the lack of physical evidence, the prosecutor was emphasizing that the jury should consider the evidence before it, and that absence of certain evidence did not warrant an acquittal. This was within the scope of reasonable argument.

 **[\*P122]**  Moody further contends that the prosecutor played to the emotions of the jury by commenting that Farr "is no longer with us and we can't hear from him." The prosecutor told the jury that Farr nevertheless spoke to them through his lack of defensive wounds (no physical altercation when shot), the location of his entrance wounds (shot from behind), the angle of the bullets (sitting down when shot), and the injuries caused by the bullets (couldn't move after his spine was severed and died quickly). The fact that Farr was deceased and could not testify was proven and not disputed. The prosecutor's statements were reasonable comments on the   evidence presented by the coroner, and they asserted that the evidence from Farr's body substantiated the eyewitness testimony about what had occurred in the lot.

 **[\*P123]**  Moody next points to statements by the prosecutor in rebuttal that "I guess they want you to think this is a conspiracy." The prosecutor continued:

> Everybody is lying except for the Defendant and they are somehow getting their stories together. In order to believe that, you would have to believe that Raymond Nicholson and Stanley Wilson and Gary Cosby and Charles Dozier somehow collaborated with [the coroner] with regard to the medical science. You have to ask yourself do you believe that? It's ridiculous.
> You know, we heard a lot of criticism about the witnesses in this case and something needs to be said about that because this defendant is the one that picked the witnesses. He chose those witnesses when he decided to gun down Jeffrey Farr in broad daylight in that dirt parking lot. Everyone that was there at that point became a witness in his case. He chose them. And now he wants to criticize them? To make fun of them because they were afraid to go to the police right away?
>
> To make you think they're liars because they didn't want to become involved in a murder case? Witness after witness told you the reasons why they delayed telling the police what they saw. If they had their preference, they wouldn't

have been sitting up here. They didn't want to become involved. Whether it was because of the neighborhood, whether it was because of fear, being labeled as a snitch — all of those. They told you.

**[\*P124]**  Again, these statements were in response to defense counsel's argument regarding the eyewitness evidence. Defense counsel had argued that six witnesses claimed to be at the scene, but none had "ever described what the shooter was wearing or given any description of the gun they now claim to have seen." Defense counsel emphasized that none of the witnesses had come forward and identified Moody as the shooter on the day of the shooting. Counsel noted that Nicholson, who later identified Moody in a photo spread, had originally told officers that the shooter was wearing all black and a mask. Defense counsel asked the jury, "Why the lies?" Viewing the transcript as a whole, we find the prosecutor's statements to be proper rebuttal argument.

**[\*P125]**  Finally, Moody claims that the prosecutor improperly appealed to the jury's emotions when he argued: "But thank goodness for Walter Jackson, and thank goodness for Raymond Nicholson, and Stanley Wilson because they did do the right thing. And because of that, we know the truth about what happened. And because they're brave enough to come in here, *justice can extend out to [the apartment complex].*" (Emphasis added.) Defense counsel did not object.

**[\*P126]**  "A prosecutor may legitimately call for justice or ask jurors to do their duty. However, a prosecutor may not ask a jury to punish a particular defendant for all of the crimes committed in the community." (Citation omitted.) *State v. Jefferson*, 2d Dist. Greene No. 2002 CA 26, 2002-Ohio-6377, ¶ 18. To the extent that the prosecutor suggested that a guilty verdict would provide justice for the larger community (the apartment complex), we do not find this isolated remark was prejudicial, let alone rises to the level of plain error, when viewed in the context of the entire trial.

**[\*P127]**  Moody's fifth assignment of error is overruled.

*State v. Moody, supra.*

The claims of prosecutorial misconduct that were raised on direct appeal were not repeated in the Petition; in fact, the Petition asserts "the issue of fraud upon the court was presented in my 26(B) delayed appeal . . ." (Petition, ECF No. 1, PageID 9).  Respondent's counsel quite reasonably

understood the Fifth Ground for Relief as raising a claim of ineffective assistance of appellate counsel relating to failure to raise on appeal the use of an anatomical diagram with the coroner when he testified (Return, ECF No. 16, PageID 1483). Respondent therefore argued in response to that claim.

However, in his Traverse Brief, Moody does not argue his "fraud on the court" claim in his Fifth Ground for Relief. Instead, he argues a number of prosecutorial misconduct claims as Ground Five (ECF No. 22, PageID 1589-97). He has moved his "fraud on the court" claim later in the Traverse under the label "Ground Eight" *Id.* at PageID 1604. The "fraud on the court" claim is discussed below.

A petitioner cannot "amend" a habeas petition by raising new issues in a traverse. Under 28 U.S.C. § 2242, amendment of a habeas petition is governed by Fed. R. Civ. P. 15. Claims raised for the first time in a traverse are not properly before a district court. *Tyler v. Mitchell*, 416 F.3d 500, 504 (6th Cir. 2005); see also *Jaloweic v. Bradshaw*, 657 F.3d 293, 312 (6th Cir, 2011); *Murphy v. Ohio*, 551 F.3d 485, 502 (6th Cir. 2009). Moody has never moved to amend to add these prosecutorial misconduct claims. If he were to do so, the Magistrate Judge would deny the amendment as futile because the Second District's decision on prosecutorial misconduct is neither contrary to nor an unreasonable application of Supreme Court precedent.

Moody's prosecutorial misconduct claims, argued under Ground Five, are not properly before the Court and should be dismissed.


**Ground Six/Seven:** Ex Parte **Communications**


In the Petition, Moody claimed the trial judge permitted ex parte communications in

violation of his Fifth and Sixth Amendment rights. He argues this claim in the Traverse Brief as Ground Seven. In briefing this issue in the Traverse, Moody quotes at length an in-chambers but on the record conference among counsel and the trial judge about the appropriate response to a jury note. Ex parte communication happens when a judge communicates with one party without the other party being present or with a jury with neither party present. There is no evidence here of any ex parte communication. The trial judge discussed the matter with counsel for both parties and then communicated with the jury exactly what had been agreed upon.

Moreover, any claim that this in-chambers conference constituted ex parte communications or was in some other way improper was procedurally defaulted when it was not raised on direct appeal. Under Ohio's doctrine of *res judicata* in criminal cases, an issue which is capable of being raised and decided on direct appeal, as this issue was, is barred from later consideration. *State v. Perry*, 10 Ohio St. 2d 175 (1967). Ohio's doctrine of *res judicata* in criminal cases, enunciated in *Perry*, is an adequate and independent state ground of decision. *Durr v. Mitchell*, 487 F.3d 423, 432 (6th Cir. 2007); *Buell v. Mitchell*, 274 F.3d 337 (6th Cir. 2001); *Coleman v. Mitchell*, 268 F.3d 417 (6th Cir. 2001); *Byrd v. Collins*, 209 F.3d 486, 521-22 (6th Cir. 2000); *Rust v. Zent,* 17 F.3d 155, 160-61 (6th Cir. 1994)(citation omitted); *Van Hook v. Anderson*, 127 F. Supp. 2d 899, 913 (S.D. Ohio 2001).

Therefore Moody's claim of unconstitutional ex parte communications is both without merit and procedurally defaulted because not raised on direct appeal.


**Ground Six (as argued in Traverse):  Cumulative Error**


In his Traverse Brief, Moody argues that cumulative errors in the trial deprive him of a fair

trial. As with his prosecutorial misconduct claims, this argument t is not properly before the Court because it was not pleaded in the Petition. Any request to amend to add a cumulative error claim would be futile because cumulative error does not constitute a constitutional violation. *Sheppard v. Bagley*, 657 F.3d 338, 348 (6th Cir. 2011), *cert. denied,* 132 S.Ct. 2751 (2011), *citing Moore v. Parker,* 425 F.3d 250, 256 (6th Cir. 2005), *cert. denied sub nom. Moore v. Simpson,* 549 U.S. 1027 (2006); *Moreland v. Bradshaw*, 699 F.3d 908, 931 (6th Cir. 2012), *cert. denied sub nom. Moreland v. Robinson*, 134 S. Ct. 110 (2013).

**Ground Six/Eight: Fraud Upon the Court**

In his Sixth Ground for Relief as pleaded in the Petition and Eighth as argued in the Traverse Brief, Moody claims fraud on the court was committed by the introduction of a forged "autopsy examination report of entrance and exit wounds." (Traverse Brief, ECF No. 22, PageID 1604).

As Moody states in his Petition, he raised this claim for the first time in his original Application for Reopening the direct appeal under Ohio R. App. P. 26(B)(ECF No. 1, PageID 9). Moody's Application was untimely, filed well outside the ninety days allowed for such an application after the court of appeals entered judgment. The Second District denied the application on this basis. *State v. Moody*, Case No. CA26926 (2nd Dist. Jul. 25, 2017)(copy at State Court Record, ECF No. 15, Ex. 41, PageID 432). The court indicated that if it were to reach the merits, it would find there had been no fraud on the court:

> As for the autopsy diagram, the excerpt of the transcript provided by Moody indicates that defense counsel (not the prosecutor) questioned the chief deputy coroner, Dr. Lee Lehman, about an autopsy diagram (Defense Exhibit A) that purported to show the

entrance and exit wounds caused by the bullets that killed Jeffrey
Farr, the victim. In response to those questions, Dr. Lehman
indicated that he had not prepared the diagram, that he had never
seen the diagram before, and that the diagram was inaccurate.
During his direct examination, Dr. Lehman had testified about the
location of the bullet wounds, and there was substantial evidence
that Farr had been shot six times and died from his injuries. We find
no reasonable probability that Moody would have prevailed on
claims that the autopsy diagram was a fraud on the court and
provided "insufficient" evidence at trial.

*Id.* at PageID 433.

In his Traverse Brief, Moody quotes the portion of the transcript where the autopsy
diagram, a defense exhibit, is being shown to Dr. Lehman by defense counsel Lachman. Lehman
says he did not draw the diagram and repeatedly disavows its accuracy. Certainly Dr. Lehman
committed no fraud on the court. Nor did the prosecution: this was a defense exhibit used in
cross-examination by defense counsel. If defense counsel produced the diagram or had it drawn
to use in cross-examination, he utterly failed to get Dr. Lehman to accept it as accurate.

In sum, any claim that use of the diagram at trial was fraud on the court was procedurally
defaulted by failing to raise it on direct appeal. *State v, Perry, supra.* That procedural default is
not excused by any ineffective assistance of appellate counsel because Moody procedurally
defaulted any such claim by filing his 26(B) Application too late. *Edwards v. Carpenter*, 529 U.S.
446 (2000). Finally, this claim is also without merit because Moody has not shown any fraud on
the court.

**Conclusion**

Based on the foregoing analysis, it is respectfully recommended that the Petition herein be dismissed with prejudice. Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability and the Court should certify to the Sixth Circuit that any appeal would be objectively frivolous and therefore should not be permitted to proceed *in forma pauperis*.

December 19, 2018.

s/ *Michael R. Merz*
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by mail. .Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 153-55 (1985).